Statement.

# 𝔒𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### JONES v. COMMONWEALTH.

#### February 2, 1905.

1. CRIMINAL LAW—*Presumption of Innocence.*—A prisoner is presumed to be innocent until his guilt has been established beyond a reasonable doubt, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent, nor is he called upon to vindicate his innocence by naming the guilty man.

2. CRIMINAL LAW—*Corpus Delicti—Guilt of Accused—Suspicion of Guilt— Case at Bar.*—To convict one of crime it must be conclusively established that a crime has been committed, and that the accused is the guilty party. Evidence simply that a fire was of incendiary origin, that the accused had an opportunity to commit the crime, and that he cherished and had expressed ill-feelings towards the owner of the property destroyed, does not warrant a conviction. In the case at bar, if it be admitted that the fire was of incendiary origin, the evidence is wholly insufficient to establish the guilt of the accused.

Error to a judgmnet of the Circuit Court of Clark county on an indictment for arson.

*Reversed.*

The opinion states the case.

*Charles M. Brown* and *F. B. Whiting,* for the plaintiff in error.

*Attorney-General William A. Anderson,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

John Jones was indicted in the Circuit Court of Clark county for burning in the night time the dwelling house and two frame outhouses, the property of Clay Carr. Upon this indictment he was tried, found not guilty of burning the dwelling house, but guilty of burning the two frame outhouses, and sentenced to a term of nine years in the penitentiary.

A number of exceptions were taken by the prisoner at the trial to the rulings of the court, but upon the view of the case taken by this court we deem it only necessary to consider whether the evidence warrants the conviction of the prisoner.

It appears that Clay Carr's residence is situated a little over half a mile northwest of Boyce; that just a little northwest of the dwelling there was a stable-barn, just fifty steps (supposed to be fifty yards) from the wing of the dwelling; that the barn was 78 feet long and 36 feet wide, with 12-foot stables on each side, and a 12-foot driveway the full length of the barn, the door to which was only fastened with a hook, and not locked; that just sixteen steps north of that barn is another barn three stories, 27 feet square. The latter was used to store machinery, corn, and some hay at the time of its destruction by fire. On the west side of the barn-yard fence, running its full length, there was a rick of fodder which ran south and north and butted up on the northwest side of the stable-barn, which rick was supposed to contain 20,000 bundles of fodder; and just over the fence east of that was a large straw rick, butting up against the south side of the barn, and supposed at that time to have had fifteen tons of straw in it.

On the night of March 18, 1904, these barns and the straw and fodder ricks were discovered to be on fire by Carr's neighbors between ten and eleven o'clock, and, it being in a very dry season, the barns, with their contents, live stock, etc., and ricks,

Opinion.

were speedily consumed—certainly by twenty minutes after eleven o'clock. During the progress of the fire the shed room of the dwelling house, it being covered with shingles, caught on fire several times, but these fires were extinguished. Just at what time this fire originated, and whether it originated in one of the barns, or the straw, or fodder rick, is not disclosed by the evidence.

After stating that he was waked up by the ringing of the farm bell by one of his neighbors, and then discovered that something was on fire, Mr. Carr testifies that he went out and found his stable-barn had fallen in, and there was only a little frame of it standing; that the fodder rick had burned down, and the straw rick about half as high as it was before; and that after he had been out, as he supposes, about a half hour or more, he remembered that he had his watch, and upon looking at it found that it was twenty minutes past eleven o'clock; so that the fire necessarily had been in progress some time prior to 10:30 o'clock, as the stable-barn had been almost entirely consumed, as well as the straw and fodder ricks, when he first went out of the house, and the fence around the lot almost entirely consumed. He further says that he was at his barn at 9 o'clock, which was his usual custom, and everything was then all right.

It further appears that prior to July 19, 1903, and for about two years, the prisoner had been in the employment of Carr on his farm; that on that day they had some disagreement and the prisoner left, going to his home; that is, to his father's, where he lived, which is about 900 yards from Carr's residence; that about one week afterwards the prisoner returned to Carr's house for the purpose of having a settlement with him of the wages he claimed to be due him; that upon this settlement Carr was of opinion that he owed the prisoner $4.00, while the prisoner claimed that the balance due him was $6.00; whereupon Carr paid the prisoner $4.00, and they parted, the prisoner saying as he walked away, "I will get even with you."

Between Carr's residence and Jones' home there is a field belonging to one Bowles, which Carr had rented for the year 1903, and there is a fence which divides this field from the lot of land owned by the prisoner's father, in which there was a gap which had been established by him.

On December 17, 1903, while in the Bowles' field attending to some other matters, Carr discovered that this gap was down; whereupon he went to the gap, dismounted from his horse, and put it up. About the time he finished putting up the gap and was tying the wire to hold it in place, he heard a rustling in the weeds behind him, and as he turned around the prisoner grabbed him in the throat with one hand and shook his first in Carr's face, and said with an oath, "If you put that gap up again, I will knock you into jelly." Upon being asked what he meant by this attack upon Carr, the prisoner replied that he had no right to be in the field at all; that Bowles had said he had no right to put it up, as it was the prisoner's father's gap. After some further colloquy between the parties, and Carr had gotten upon his horse and started away, the prisoner dared him to get off, and upon being told by Carr that he was going to Justice Struder and get a warrant, the prisoner replied, "Damn old Struder. I can whip him and you both." Carr did get out a warrant for the prisoner, and he was that evening tried by Justice Struder, found guilty of an assault, and required to pay as a fine and costs $11.85; and it is testified to on behalf of the Commonwealth that after the trial of the warrant, and Carr had left for his home, the prisoner was heard to say to some one, "Never mind; I will get even with him." Whether he had reference to Carr or to the justice who had imposed a fine upon him is left entirely to conjecture.

The next morning after the fire Carr, in looking about his premises, discovered a horse's track, coming to his place from the direction of the Bowles' field, and, supposing that it might

have been made by the horse owned by the prisoner, attempted to follow it, but upon investigation he found that the track was made by the horse of a neighbor who came to the fire that way. That track was made by a shod horse.

On Tuesday following the fire Carr discovered other tracks across his lawn in front of his house, which were prints of a bare-footed horse. These tracks were first discovered about 100 yards from the barn and within the lawn, which was covered by sod. This track was followed to within eleven steps of a gate that goes into the lawn, and there the track had been destroyed by cattle passing over it. The distance he could follow the track was about 150 yards altogether, and was going from, rather than towards the prisoner's house, and could not be tracked nearer than 900 yards from his house. At the time of the fire the prisoner's father owned a horse which was unshod, and about the size of a horse that would have made a track similar in size to the track found on the lawn.

On Saturday, the 26th of March, eight days after the fire, two persons, witnesses in this cause, took the horse just referred to, and which it was shown that the prisoner was riding at Boyce on the evening of the fire, to Carr's lawn, and a comparison made of the size of its feet with the tracks found by Carr on Tuesday morning. They say that they put three of the feet into these tracks, and that they appeared to make "a perfect fit"; and that the length of the step of the horse was the same apparently as the step of the horse that made the tracks in question. There was nothing, however, peculiar about the horse's feet to distinguish the tracks made by it from tracks that may have been made by some other horse.

It further appears that Mrs. Pyle, who lived on Carr's premises, a short distance from the buildings that were burned, on the night of the fire had occasion to go out on the porch and get water for her sick child, and while there heard Carr's dogs

barking furiously in front of Carr's residence, and heard a voice, but could not say whether it was the voice of a man or a woman. Upon hearing this voice the dogs ceased barking, and she states that about that time she heard a horse going towards Carr's gate, which seemed to be running very rapidly. This witness went back into her house, and after being asleep, she does not know how long, she was aroused by the ringing of the farm bell, which she says was about 11 o'clock, and that was the first she knew of the fire.

With reference to his dogs, Carr states that they were good guards, one a shepherd's dog and the other a bull dog, and he was asked to state if they knew the prisoner well, to which he answered, "Yes, sir; he had worked for me over two years, and they knew him."

Q. Were they in the habit of following him

A. They were, with the wagon. I have known them to follow him with the wagon time and again.

It further appears that no one noticed the presence of these dogs about the fire or on Carr's premises until the fire was pretty well over, when one of them appeared and seemed very much subdued. The prisoner is not shown to have been on Carr's premises since his visit there in July prior to the fire above mentioned, nor is it shown that these dogs were seen following him thereafter, nor any circumstance tending to show that he retained, at the time of the fire, the control over them that he had when living with Carr.

We have stated above all the facts testified to on behalf of the Commonwealth, with the exception as to the time the prisoner left Boyce on the night of the fire, as to which there is great conflict. George Harrison testifies that he saw and talked with the prisoner at Boyce, and by an estimate made by him of the time at which he left the prisoner sitting in a store at Boyce he judged that it was about a quarter past nine;

while the prisoner claimed, and was corroborated by a number of witnesses who lived in the house with him, that he reached home at 9 o'clock, and was in bed by a quarter past nine, and that he never left the house thereafter that night.  Harrison says, with reference to his clock, that he kept it regulated by the trains, and usually set it once or twice a day in order to keep it running with the time of the railroad.

So that the conflict in the evidence as to the time when the prisoner left Boyce only involves a difference in the estimates made of some fifteen or twenty minutes, which was sufficient for the prisoner to have reached his home by 9 o'clock, and it appears by the evidence of the Commonwealth that he was seen riding towards his home by the public road, and the usual route for him to have taken, though also the route to Carr's place, a little before or a little after 9 o'clock.

Effort was made to prove that the prisoner was not at home at 10 o'clock, and that circumstance is relied on here; but the record shows that the statement of the witness, Henry Taylor, upon that point was ruled out by the trial court; and Willie Harris, who was at the time with Henry Taylor, who had stated that Harris called at prisoner's home for him about 10 o'clock and got no answer, testifies that he and Taylor passed prisoner's home about 8 o'clock, and upon his (Harris) calling for him, learned that he had gone to Boyce.

Much stress is laid upon the fact, admitted by the prisoner, that he knew nothing of the fire until next morning when he had started out to his work; but this circumstance loses its criminating force when it is testified to by a witness for the Commonwealth, Henry Taylor, who was at the time working for Carr, and had left his house the night of the fire after supper, that he and another slept in a room with a window next to Carr's, and in a house on an adjoining lot to the prisoner's, but nearer to the scene of the fire, and knew nothing of it till they went out of the house about 5 o'clock the next morning.

"The prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty man. He rests secure in that presumption of innocence until proof is adduced which establishes his guilt beyond a reasonable doubt, and whether the proof be direct or circumstantial, it must be such as excludes any rational hypothesis of the innocence of the prisoner." *McBride's Case*, 95 Va. 826, 30 S. E. 454.

"The rule in criminal cases is that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, avails nothing unless the *corpus delicti*, the fact that the crime has been actually perpetrated, be first established. So long as the least doubt exists as to the *act* there can be no certainty as to the criminal agent." 1 Starkie on Ev., 510.

"Evidence only that a fire was incendiary, that the defendant had an opportunity to commit the crime, and that he cherished ill feelings towards the owner of the property destroyed, does not warrant a conviction." *Garner* v. *Commonwealth*, 2 Va. Dec. 458, 26 S. E. 507.

In that case a mill-house was burned, tracks were discovered the next morning about the mill and led from it in the direction of the prisoner's house, which corresponded in measurements and other characteristics with the prisoner's footprints (were, in fact, his tracks), and there was ill-feeling between the owner of the mill and the prisoner. The opinion in that case, by Keith, P., says: "The utmost that can be said of the proof is that it shows the burning of the mill as the act of an incendiary, that the prisoner had the opportunity to commit the crime, and that he cherished ill-feelings towards the owner of the property destroyed. These circumstances were sufficient to cause the pris-

oner to be suspected of the crime, and rendered an investigation of it proper to ascertain whether or not he had any connection with it, but . . . fall short of that degree of proof which warrants a conviction, or which will sustain a verdict under our statute, which requires us to consider the motion for a new trial as upon a demurrer to the evidence by the prisoner. There is no evidence whatever which connects the prisoner with the crime charged, and all that is shown in the record may be true (doubtless is true), and, at the same time, be entirely consistent with the innocence of the accused."

In *Prior's Case*, 27 Gratt. 1009, the proof was that the fire in question was the work of an incendiary; that the accused had made threats, which might have been reasonably construed as an intended purpose on his part to do the owner of the property burned an injury. Tracks were found near the burned building which corresponded in size and other respects with the tracks made by the accused, and the evidence was that the tracks were made by one wearing a shoe similar to that of the accused. These tracks were traced in the direction of the accused's house for more than half a mile. In the opinion in that case it is said that the only circumstances in the case which tend to raise a suspicion against the accused are that a track was found on the morning after the barn was burned, which witnesses said they recognized as the track of the accused. This was considered by the court as only the opinion of the witnesses and not proof; and upon the whole case it was considered that the facts proved were plainly insufficient to warrant the verdict of the jury, and a new trial was granted.

In the case at bar it is frankly and properly conceded that the facts as to the horse's tracks alone would not have been sufficient to justify a conviction, the tracks disclosing no peculiar formation of the hoof of the horse making them. We say that this was properly conceded, because it is admitted that be-

tween the time that the tracks were made and the following Saturday there was not only weather producing freezing at night and thawing in the day, but there had been a very heavy rain; and the uncontradicted proof adduced by the prisoner from experienced men, blacksmiths included, was that unless there was some peculiar formation about the horse's hoof, which would make an impression in a track, it would be impossible to identify a track as having been made by any particular horse. As we have seen, there was no peculiar formation about the hoof of the horse ridden by the prisoner on the evening of the fire, and it was simply a track that might have been made by any number of horses requiring a No. 2 shoe, as it is shown this horse required.

There is no direct evidence tending to prove that this fire was the work of an incendiary, and not the result of an accident, and there is no attempt whatever to prove that it could not have originated in any other mode than that of an incendiary fire.

"Where a building is burned, the presumption is that the fire was caused by an accident rather than by the act of the accused accompanied by a deliberate intent." 3 Cyc., 1003.

It is true, as counsel contend, and unfortunately so, "that in the nature of things it is generally extremely difficult to prove by direct testimony that an incendiary who sets fire to his neighbor's property actually started the conflagration," and this kind of proof is not required to convict of the crime of arson; but the coincidence of circumstances relied on to convict, however strong and numerous, must conclusively prove (1) the fact that the crime has been perpetrated, and (2) that the accused is the guilty party.

If we were to concede that the evidence in this case was sufficient to show that the fire was incendiary, that the defendant had an opportunity to commit the crime, and that he

cherished ill-feelings towards Carr, the owner of the property destroyed, this, according to the authorities which we have already cited, is not sufficient to warrant a conviction; and this, in our opinion, is all that the evidence for the Commonwealth, considered under the rule governing its consideration, establishes. The most that can be said of the evidence is that it is sufficient to raise a suspicion of the guilt of the accused; but, in our opinion, it is plainly insufficient to warrant the verdict of the jury.

Therefore the judgment of the Circuit Court of Clark county refusing to grant the prisoner a new trial must be reversed and the cause remanded for a new trial.

*Reversed.*