# Wytheville

GEORGE O. STINE V. COMMONWEALTH.

June 14, 1934.

Present, All the Justices.

The opinion states the case.

*Leith S. Bremner, W. C. Bibb* and *Robt. T. Winston,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

CHINN, J., delivered the opinion of the court.

George O. Stine was indicted at the March term of the Circuit Court of Louisa county, 1933, for burning a certain building in the town of Mineral, known as the Bumpass Hotel, "with intent to injure the insurers." At the same term of the court, Stine was placed on trial for the offense charged in the instrument, was found guilty by the jury, and his punishment fixed at two years in the penitentiary. On motion of the accused, the trial court, for reasons which do not appear, set aside the verdict and granted a new trial. The new trial commenced on May 31, 1933, which also resulted in a verdict of guilty,

and a sentence of three years in the penitentiary. From that judgment of the court the accused has obtained this writ of error.

Several assignments of error are made in the petition, but in the view we take of the case it is only necessary to consider the assignment that the evidence is insufficient to support the verdict, which question was properly raised in the court below by motion to strike, and by motion to set aside the verdict on the ground that the same is contrary to the law and the evidence. The building referred to, together with its contents, was completely destroyed by fire in the early morning of November 20, 1932. The main building was a long frame structure, two stories in height, fronting or facing toward the railroad, on which front a two-story porch extended its entire length. To the rear, or easterly side of the building from this front, were two low one-story annexes used as kitchens, attached at right angles to the main structure, the longer of which was directly back of the main entrance and lobby. This annex extended back thirty-six feet and contained two rooms separated by a partition twelve feet from the wall of the main building. It had a metal roof which on the inside was unceiled and open. In the room of this kitchen next to the main building there was a small chimney or flue, and an oil and an iron cook stove.

At the time of the fire the building was unoccupied, and it is impossible from the testimony to determine with any degree of accuracy the time the fire started. It seems to have been first discovered about 3:30 A. M. by the Taylor family, who gave the alarm, but none of whom testified. It undoubtedly appears, however, that the first persons to reach the scene of the fire were W. H. Noel and James H. Kennedy, both of whom are reputable and disinterested witnesses. Mr. Noel, who testified in behalf of the Commonwealth, claims that he got there first, but only "two or three minutes" ahead of Mr. Kennedy, a witness for the accused, who says that he was the first to arrive at the fire, and Mr. Noel next. The Commonwealth relies

principally on Noel's testimony to prove that the fire was of incendiary origin. This witness testified that when he got there fire was coming out from under the eaves of the large one-story annex back of the main building about eight feet from the main body of the building, and was also coming through the weather boarding above the annex under and around a window on the second floor of the main building, and that there were two separate fires, one in the annex and one on the second floor of the main building. It was testified by Mr. Kennedy, that when he first got there the reflection of the fire was shining out on the front porch, and upon looking through the lobby from the front part of the main building he could see that the fire had burned through the partition wall between the annex and the main building, and extended as far up as the second floor; and that the fire, though burning in both the annex and the main building, was one continuous blaze. In other words, this witness says that it was impossible to tell exactly at what point in the kitchen the fire started, but there was only one fire. Mr. Noel also testified that he did not go around to the front of the building but viewed the fire only from the rear, and that he had been there only five or ten minutes before the kitchen roof fell in. It is, therefore, apparent that, whatever difference there may be in the accounts given by these two witnesses, the fire was far advanced when they reached the scene, and it is also apparent, from Mr. Noel's own testimony, that he was not in a position to see what was going on, or had happened, on the inside of the building, and his conclusion that there were two separate fires was based solely upon the fact that he saw the fire outside in two separate places.

It was shown that there was no electric current in the building at the time of the fire, but it also appears that it had been reported to the town authorities that the place was being frequented by poker players and bootleggers, and for that reason the town sergeant visited the premises after midnight on the night of the fire.

In *Jones' Case*, 103 Va. 1012, 49 S. E. 663, 666, this court said:

" 'Where a building is burned, the presumption is that the fire was caused by an accident, rather than by the act of the accused, accompanied by a deliberate intent.' 3 Cyc. 1003.

"It is true as counsel contend, and unfortunately so, 'that in the nature of things it is generally extremely difficult to prove by direct testimony that an incendiary who sets fire to his neighbor's property actually started the conflagration,' and this kind of proof is not required to convict of the crime of arson; but the coincidence of circumstances relied on to convict, however strong and numerous, must conclusively prove, (1) the fact that the crime has been perpetrated, and (2) that the accused is the guilty party."

In *Brown* v. *Com.*, 89 Va. 379, 16 S. E. 250, 251, the court quoted Bishop's Crim. Proc. sections 1058-59, as follows:

" 'On the whole, the doctrine may be said to be that special care should be exercised as to the *corpus delicti,* and there should be no conviction except where this part of the case is proved with particular clearness and certainty.' "

We now come to consider the circumstances relied on by the Commonwealth to prove that the accused actually perpetrated the crime charged against him.

It was proved by clerk of the court, Mr. P. B. Porter, that on September 19, 1929, the Bumpass Hotel was conveyed by the People's National Bank of Charlottesville to R. S. Kretzer, and on the same day, said Kretzer conveyed the property to J. G. Ballard, trustee, to secure "the holder" payment of the sum of $2,000 evidenced by certain notes. That subsequently Kretzer conveyed said property, subject to aforesaid deed of trust, to L. S. Mennonni, who, on August 11, 1930, deeded it back to Kretzer on the same terms. That by deed dated November 10, 1932, in consideration of $10.00 and other valuable consideration, R. S. Kretzer conveyed the hotel to L. J. Kidd, and on the

same day said Kidd conveyed the same to E. O. McCue, trustee, to secure the sum of $4,100 "evidenced by notes." That on the same date, L. J. Kidd also executed a deed of trust to E. O. McCue, trustee, conveying the furniture therein described and located in the Bumpass Hotel to secure "the holder" of notes aggregating $1,100. It was admitted by the accused that, while legal title to the hotel property stood in the name of R. S. Kretzer at the time he conveyed same to Kidd, as aforesaid, said property really belonged to the accused, though he does not seem to have made any concealment of this fact as it was testified by a number of Commonwealth witnesses that the accused claimed the property belonged to him and treated it as his own. The deal between Kretzer and Kidd, for the sale of the property, was negotiated and handled by one J. P. McDaniel, representing Kretzer, or the accused, and one G. M. Garrett, acting as agent for and in behalf of the purchaser, Kidd. At the time of the transaction, the accused resided in the city of Richmond, and seems to have been interested in farming, and to have also dealt to a considerable extent in real estate, both in and outside of the city. Kretzer lived with the accused, and is his brother-in-law. McDaniel, at the time had been in the employ of the accused since March, 1932. It does not clearly appear what his duties were except that he assisted the accused in his real estate transactions, and was paid by the week, though he was sometimes paid a commission. Garrett, who was also living in the city of Richmond, had been prior to the transaction a wholesale lumber dealer, but at that time was in the business of real estate agent on his own account. It seems that Kidd's principal business was trading in real estate.

On November 14, 1932, four days after the deeds referred to were executed, Kidd accompanied by McDaniel and Garrett went to the office of W. H. Sanders, fire insurance agent, and obtained insurance on the hotel building amounting to $5,000, and insurance on the furniture for $1,100. According to the testimony of Mr. Sanders,

the insurance on the building was in three separate policies, and in the event of loss payable as follows: One policy for $2,000 was made payable to "L. J. Kidd and the People's National Bank of Charlottesville, trustee, and E. O. McCue, trustee;" another policy for $2,000 was made payable "to L. J. Kidd and the People's National Bank of Charlottesville, trustee, first, and E. O. McCue, trustee, second;" and the third policy of $1,000 was made payable "to L. J. Kidd, People's National Bank of Charlottesville, and E. O. McCue, trustee." The insurance on the furniture was made payable "to L. J. Kidd and E. O. McCue, trustee, but in the event of loss to L. J. Kidd and E. O. McCue, as his interest may appear."

The estimates of value placed upon the property were given the insurance agent by Garrett, who had examined and appraised the hotel and furniture for Kidd before the sale was consummated, and Kidd gave a note for the premium. The insurance agent gave the policies to Kidd, who turned them over to McDaniel; and McDaniel took them across the street and gave them to the accused along with the deeds of trust, and the notes above referred to. The Commonwealth introduced several witnesses who expressed the opinion that owing to the depressed conditions then existing, the market value of the hotel at the time it was sold to Kidd was $2,500 or $3,000, and that the furniture, if sold to the highest bidder, would have brought from $75 to $150 only. On the other hand, the Commonwealth's witness, McDaniel, testified that the hotel could not have been put up for the amount of insurance that was on it; and it was testified by Garrett, who, in company with McDaniel, made a careful examination of the property, that he valued the building at $7,000, and the furniture at $1,500. It also appears that the building, especially the older part, was of excellent material and well constructed, and that it had recently been painted and put in good order and condition throughout.

The Commonwealth contends that the foregoing evidence shows the property was over-insured, and that

the accused had a motive for burning it. There is, however, no evidence to show that the accused had anything to do with the amount of insurance placed on the property, nor does it by any means clearly appear from the policies or otherwise, that the accused had any interest in the insurance at the time the fire occurred. It does not necessarily follow from the fact that the accused had an equitable interest in the property at the time of the sale to Kidd, that the accused had any interest in the insurance under the policies in the event of loss.

At the time of the sale of the Bumpass Hotel to Kidd, A. H. Compton, town sergeant of Mineral, was occupying the building, with the consent of the accused, as caretaker. After the hotel was sold, accused arranged for Compton to move to the "Coleman building," which seems also to have been either owned or controlled by the accused. Compton moved on Thursday, November 17. On the same day accused took Kretzer, McDaniel and three colored men to Mineral and moved some furniture into and out of the hotel. Going up from Richmond, McDaniel and the accused traveled in the latter's car; Kretzer and the negro helpers rode in a truck belonging to the accused. The Commonwealth lays much stress on this circumstance as tending to show that the accused acted on this occasion as though he still owned the furniture. In the voluminous testimony on the subject the only definite evidence is that of the Comonwealth's chief witness, McDaniel, the substance of which is that the accused transferred to the hotel two truck loads of furniture and a piano which he had stored in the "Coleman building," and took five or six pieces of furniture out of the hotel and stored it in the "Safely Place," another building in Mineral owned or controlled by the accused. All this was done openly, in broad daylight, in view of the citizens of the town, and without any apparent attempt at secrecy. Compton testified that after all the moving was over that evening, he himself extinguished the lights, and locked up the hotel, and kept the key; that McDaniel asked him

for the key but he refused to give it to him. We hardly think these facts are sufficient to show that the actions of the accused were governed by criminal intent. If any furniture was taken out of the hotel which rightly belonged to Kidd and was covered by the insurance, it could easily be shown under the circumstances, if necessary, in the adjustment of loss. It moreover appears from the Commonwealth's evidence, taken as a whole, that there was sufficient furniture in the hotel at the time of the fire to furnish same throughout.

McDaniel further testified that the day they went to Mineral to move the furniture, the truck carried among several other articles, two five gallon cans with flat tops, which were placed in the "Safely building," but he did not examine the cans and did not know what they contained. Several days after the fire a can was found in the "Safely Place" which a witness testified contained a liquid that would burn and had the odor of kerosene, and was supposed to be kerosene oil. Upon being shown this can McDaniel refused to identify it as one of those brought up on the truck. There was also found among the debris in the basement of the burned building a five gallon can which "looked something like" the can found in the "Safely Place." The only basement in the Bumpass Hotel was in the southern end of the main building, some distance from the kitchen annex where the fire started as hereinbefore described. McDaniel also testified that on the day the property was insured the accused told him he had a trade on with Mr. J. G. Ballard, of Charlottesville, for the notes, and they left at once for Charlottesville to see Mr. Ballard, but he did not know whether the trade was made or not; he "imagined" it was, as he heard nothing more about it.

This witness further testified that when they passed through Mineral on their way to Charlottesville the accused remarked that the property "is sold now, and I am glad to get rid of it. Said it had been a kind of a Jonah to him, looked like nobody wanted it, and it was all over

now, and if somebody happened to strike a match, it would be all over with."

Witness next stated that on Saturday the 19th, the accused came by his home.

"Q. Tell the jury what he had to say to you.

"A. He came by that morning and I drove him on out of town, and I asked him when we were going back up to Mineral, that we had not finished putting the furniture up there, and he said that the list we gave Mr. Kidd was not there, and he said there was enough there, and he asked me if I would drive his car for him that night up to Mineral and I told I would not, and he said for me to see him at Saunders' Drug Store around one o'clock, so I got over there a little before and he came around or pretty close after one, and there was no more said about that at all. I waited around there for several hours. Mr. Newman was there to see him, his truck was there loaded with a load of feed to go to the farm, and they all stayed around there until pretty near sundown and he called me over there and gave me a little check, it was Saturday and told me he had to go to Hopewell, and I did not see him any more.

"Q. When he asked you to drive his car up to Mineral, what did he say?

"A. He said, I did not have guts enough; that I was not worth a damn anyway; that I couldn't drink whiskey or anything."

"Q. Did he tell you what he proposed to do up there that night?

"A. Said he had a little work he wanted to do and that all he wanted me to do was to drive the car."

McDaniel was indicted with the accused as an accomplice and it is admitted by the Attorney-General in his brief that there are not only inconsistencies in his testimony, but it is also at variance in material respects with a written statement made by McDaniel before the first trial of the case and he became a witness for the Commonwealth. He was also discredited in other particulars.

Assuming this evidence of McDaniel to be true, the alleged statements can as well be construed in favor of the innocence as well as of the guilt of the accused. They certainly cannot be construed as a declared purpose to commit the crime.

It appears from the testimony of E. S. Ryan, a resident of Hopewell and a witness for the Commonwealth, that he saw the accused in Hopewell that afternoon about 5:30 o'clock, and, while he was not certain, he was satisfied that the accused was not in Hopewell later than 8:00 o'clock that evening..

An effort was made by the Commonwealth to prove by the evidence of one John Shealor, that the accused was in Mineral after midnight on the night of the fire. This witness testified that he was out playing poker with certain other young men the night of the fire, and that he left to go home between 3:30 and 4:00 o'clock; that on his way home he saw what he took to be a maroon colored Chevrolet automobile going through Mineral towards Richmond, at about fifteen miles an hour, with only the parking lights burning; that he noticed that the license number was in the twelve thousands but he only saw the number 12 and a dash, and did not observe what the other figures were, nor could he see who was in the car, or how many. He also testified that he saw about the same time another car going towards Richmond, and also one going in the opposite direction, but he could not tell the license number or color of either of these cars. That several of the card players were considerably under the influence of liquor and that he himself is a drinking man, but did not see anybody take a drink that night. It was also proved by the Commonwealth that the automobile then belonging to the accused was a maroon colored Chevrolet sedan, with license No. 12-291.

It seems needless to observe that this evidence falls too short of its purpose to be considered as even tending to prove the presence of the accused at or near the scene of the alleged crime on the night in question. Shealor's

evidence neither identifies the car referred to, nor does it identify the occupant or occupants. The car he saw might have been any car of the same color and make, with license number between 12,000 and 13,000.

On behalf of the accused it was testified by A. H. Brown that about eight o'clock on Saturday evening, the 19th, he took the Chevrolet sedan belonging to the accused to his garage in the city of Richmond to do some work on the motor, in which he was assisted by his brother J. S. Brown, and that he kept the car in his possession until the following day. J. S. Brown testified to the same effect. To all intents and purposes, these two witnesses are entirely disinterested, and their testimony is in no wise attacked.

We have endeavored to set forth in the foregoing statement all the pertinent and material facts and circumstances testified to on behalf of the Commonwealth, and relied on to prove the accused guilty of the crime charged against him. If we were to concede that the evidence is sufficient to show that the fire was incendiary, we think the facts and circumstances relied on are plainly insufficient to show that the accused was the guilty agent, but at the most only constitute circumstances of suspicion which, if true, are not inconsistent with his innocence.

What was said by the court in *Johnson's Case,* 29 Gratt. (70 Va.) 814, is applicable here: "These circumstances, taken singly or together, while they create a suspicion of guilt are yet inconclusive and wholly insufficient to prove such guilt, but are also consistent with the fact of innocence. If they be not at least as consistent with the fact of innocence, as with the fact of guilt, they certainly do not amount to such a degree of proof as to connect the accused with the offense and to warrant his conviction thereof."

"The prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent; nor is he called upon to vindicate his own

innocence by naming the guilty man. He rests secure in that presumption of innocence until proof is adduced which establishes his guilt beyond a reasonable doubt; and, whether the proof be direct or circumstantial, it must be such as excludes any rational hypothesis of the innocence of the prisoner." *McBride's Case,* 95 Va. 826, 30 S. E. 454, 457; *Jones' Case,* 103 Va. 1012, 49 S. E. 663.

In *Garner* v. *Commonwealth,* 2 Va. Dec. 458, 26 S. E. 507, a mill house was burned, and tracks were discovered the next morning about the mill and led from it in the direction of the prisoner's house, which corresponded in measurements and other characteristics with the prisoner's footprints (were, in fact, his tracks), and there was ill-feeling between the owner of the mill and the prisoner. The opinion in that case, by Keith, P., says: "The utmost that can be said of the proof is that it shows the burning of the mill as the act of an incendiary; that the prisoner had the opportunity to commit the crime, and that he cherished ill-feelings towards the owner of the property destroyed. These circumstances were sufficient to cause the prisoner to be suspected of the crime, and rendered an investigation of it proper to ascertain whether or not he had any connection with it, but * * * fall short of that degree of proof which warrants a conviction, or which will sustain a verdict, under our statute, which requires us to consider the motion for a new trial as upon a demurrer to the evidence by the prisoner. There is no evidence whatever which connects the prisoner with the crime charged, and all that is shown in the record may be true (doubtless is true), and, at the same time, be entirely consistent with the innocence of the accused."

In *Pryor's Case,* 27 Gratt. (68 Va.) 1009, it was proved that the fire in question was the work of an incendiary; that the accused had made threats which might have been reasonably construed as an intended purpose on his part to do the owner of the property burned an injury. Tracks were found near the burned building which corresponded in size and other respects with tracks made by the accused,

which were traced in the direction of the accused's house for more than half a mile, and which witnesses said they recognized as the tracks of the accused. This was considered by the court as only the opinion of the witnesses and not proof; and it was held that the facts proved were plainly insufficient to warrant the verdict of the jury, and a new trial was granted.

Upon careful consideration of the whole case, and in the light of the foregoing authorities, we are of the opinion that the judgment of the trial court should be reversed, and the cause remanded for a new trial to be had therein if the Commonwealth should be so advised.

*Reversed and remanded.*