# Richmond

T. J. HAMILTON V. COMMONWEALTH.

January 17, 1935.

Present, All the Justices.

The opinion states the case.

*Jacob H. Lavenstein,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

CHINN, J., delivered the opinion of the court.

Petitioner, T. J. Hamilton, and Hattie Morgan, wife of Leonard Morgan, were jointly indicted in the Hustings Court of the city of Petersburg for the murder, by poison, of said Leonard Morgan. The accused was separately tried, convicted of murder in the first degree, and sentenced to confinement in the State penitentiary for life.

The only error assigned in the petition is the refusal of the trial court to set aside the verdict on the ground that it was contrary to the law and evidence because the *corpus delicti* was not proven, and also for the reason that the Commonwealth failed to show, if the deceased died from poisoning, that the poison was administered or furnished by the accused for that purpose.

The evidence is certified in narrative form, and is herein placed in quotations only where the same appear in the certificate of the judge. The evidence is in substance as follows:

The deceased, a colored man, who lived at 1002 High Pearl street, in the city of Petersburg, was taken suddenly ill at his home about five o'clock on the afternoon of July 20, 1933, and died about one hour afterwards. About four o'clock that afternoon the deceased was cutting grass in his yard when he was requested by a neighbor, Ed Chapman, to fix a board in the floor of the latter's store across the street. According to Chapman, deceased remarked, "All right, I will fix the board for you. You are liable to have to shroud me before day." After doing the work for Chapman, Morgan returned home and again began cutting grass, when Daisy Peace came to pay a visit. When Morgan saw Daisy he called out to his wife that company was coming, whereupon Hattie Morgan came out on the porch and began talking to Daisy. In the meantime Morgan went into the house and had been there only a few minutes when,

according to Daisy's testimony, he called out to Hattie that he was "awful sick." Hattie and Daisy then ran into the house and found Morgan sitting in the living room. Hattie said, "Leonard, what is the matter?" and they begun rubbing and fanning him. Hattie then ran out and sent for Doctor McCoy, a colored practitioner, who arrived in a few minutes. Both Daisy Peace and Ed Chapman, who had come in, testified that Morgan was perspiring freely, seemed to be suffering a good deal of pain, and his breathing was rather rapid. Doctor McCoy testified that he found Morgan sitting in a chair; that he was perspiring profusely and seemed to be in great pain; that he gave Morgan a tablet to relieve the pain; that Morgan did not talk during the entire time that he was present; that he placed his hand on Morgan's stomach and it was tight, and he asked Morgan to nod his head if the pain was where he put his hand, and Morgan nodded his head. Chapman and another neighbor then helped Morgan to his bed, when Morgan seemed to be unable to walk and dragged his feet. They tried to get him to take a drink of soda, but he was unable to swallow, the liquid running out of his mouth. Daisy Peace, Chapman and Doctor McCoy all say that Morgan did not vomit, have a bowel movement, or pass any water from the time he was stricken until his death.

Doctor McCoy attributed Morgan's death to acute indigestion and filled out a certificate to that effect. This was not acceptable to the city health department, whereupon Doctor McCoy amended the certificate by adding "heat prostration" as a contributory cause. This also proved unacceptable to the health authorities, and Doctor E. L. McGill, the city coroner, was then requested to look into the case.

After questioning Hattie Morgan and talking to Doctor McCoy in regard to Morgan's symptoms, Doctor McGill then told Doctor McCoy that he would judge from the symptoms that Morgan died of *angina pectoris,* and suggested that he prepare another death certificate, stating that Morgan's death was due to that cause, which was done.

Morgan's body was turned over to a colored undertaker a short time after his death, and was embalmed.

It is testified by H. C. Davis, a colored man living in Petersburg, that on July 4, 1933, accused asked him to take him to Richmond to get some medicine; that accused told Davis that "he had a job to do at the corner of High Pearl and Virginia avenue, he had to knock a man off his feet"; that the man had heavy insurance, and that he was going to get $300 for the job; that he refused to take accused to Richmond; that he next saw the accused on Friday, July 13th, when accused told him: "I will have a fist full of dollars in a few days; I am going to get it from some insurance;" that the next time Davis saw the accused he was driving past Davis' house in a car with L. C. Cooper; that they stopped the car and accused came on the porch and pulled some papers out of his pocket and said: "I bought this car and have accomplished my job"; that accused then stated to the witness that the men of Petersburg did not have sense enough to make money; that the witness never saw the accused after that conversation.

L. C. Cooper, another colored witness for the Commonwealth, testified that he met up with the accused on Harding street in Petersburg on the morning of July 24, 1933, four days after Morgan's death, at which time accused told Cooper he was "going down the street to a garage on Halifax street. I've come into your town and am about to get lucky." Cooper asked accused: "What do you mean by getting lucky, did you hit the numbers?" to which accused replied: "No, I pulled a deal up here." Accused then asked witness if he knew a woman up on High Pearl street by the name of Hattie Morgan, and upon being answered in the affirmative, accused remarked: "I will have two or three hundred dollars in a few days." The next day Cooper wrote a letter to Hattie Morgan, telling her he wanted to see her as soon as possible, his intention being to warn Hattie Morgan of the accused. Cooper went to Hopewell and mailed the letter there. The following Thursday accused appeared at Cooper's home and asked him if he had

been in Hopewell that week. When Cooper replied, "No. Why?" accused then asked him if he had written Hattie Morgan a letter. Cooper told him: "No." Accused then said: "I have one with your name and address signed on it, and mailed from Hopewell." Cooper still denied writing the letter and accused then left saying he was going up to Hattie Morgan's house, and he went in that direction. Accused came back to Cooper's house early the next morning and again asked him about the letter. Accused said he did not believe Cooper had written it, but that it was a frame-up. The accused then said: "I'll tell you something if you don't say anything about it, I pushed her old man over last Thursday evening and I will be a fat boy in a few days. I am going to get some money. Now, keep your mouth shut and don't say anything about it and I will give you some of the money when I get it." Accused then started out, but came back and asked Cooper if he knew how long it would take the Metropolitan Life Insurance Company to pay off.

The next Thursday the accused came up to the Halifax street garage where witness then was, and called him on the outside and said: "I have bought a car"; and asked him to go down to the Petersburg Motor Company with him. On the way accused told Cooper that "this woman" tried to beat him out of his money; that he had to draw up a contract and make her pay for his car; that he was a smart fellow and knew what to do, and showed witness some newspaper clippings, and said there was another job he had done; that he had something tasteless that could be given in either water or tea, or something like that, and that it would kill almost immediately. Witness further testified that the accused was supposed to sell medicine and was known to him and others as "Doctor Hamilton."

It is testified for the Commonwealth by Reverend B. J. Hill, a colored minister, that while walking up Federal street in the latter part of July, 1933, he was accosted by a man who introduced himself as Doctor Hamilton, and asked him if he was Reverend Hill; that accused then told him he could do anything, and could show him how to make

money; that witness then asked Hamilton "What proof can you point out to me that you can do what you say?" and the accused replied: "Do you know this fellow Leonard Morgan who died?" and witness answered: "Yes." The accused then said: "They got me to stop him from the habit of drinking. I found out how much money was behind him, and I bumped him off"; that accused then told witness that he (witness) was pastor of a big church, knew a lot of people, and that if he (witness) would find out about their insurance "we could bump them off" and make some money.

Louise Brown, another witness for the Commonwealth, testified that the accused came to her home on August 3, 1933; that she was sitting in the front room, and accused said: "Good morning, what do you know?"; that she said: "I don't know anything"; and he said: "Have you seen anybody, have you seen that Morgan woman?" Witness told him she had not, but she had heard that Hattie Morgan's husband was dead; that accused replied: "I know all about that, that's some of my work. Damn'd if we didn't knock him off. I can do anything I want to do"; that accused came by in a new car that afternoon and talked to witness about Charlie Braxton, who boarded with her, and proposed to her that they "knock him off" and collect the insurance.

H. Carter Myers, a witness for the Commonwealth, testified that he was manager of the Petersburg Motor Company, and that accused came to his place of business and asked to look at some cars; that he showed him a car which was priced to him at $200 cash; that accused said he would take the car and would have the money in about a week; that he was getting some insurance money which was not coming to him, but to somebody else; that on the following Thursday accused returned and informed witness that the money would be paid in about a week or something like that; that he came back three or four times and finally told the witness that somebody else was the beneficiary of the life insurance, and that if he would go with him to 1002

High Pearl street, everything would be all right. The witness then drove the accused to High Pearl street and found that Hattie Morgan lived there. In a few minutes the accused and Hattie Morgan came out, Hattie saying she was going to furnish the money from the Metropolitan Life Insurance Company; that the witness, Hattie Morgan and the accused went to the office of the agent of the insurance company and all three then went to witness' office where Hattie Morgan signed an order authorizing Metropolitan Life Insurance Company to pay Petersburg Motor Company $300, and directed the last named company to keep $213 in payment for the automobile sold the accused, and to pay the balance in cash to the accused; that subsequently he was notified that the money had come in and all this was carried out accordingly; that on the way to Hattie Morgan's house, accused told the witness (Myers) that Hattie Morgan would buy a car, and that he could get some business for him; that a woman down on Harding street was going to get some money before long and Myers could sell her a car; that witness then asked the accused how it was that he was "so strong with these widows"; and accused replied: "They does what I tell them."

The foregoing statements of the accused, and the fact that he purchased a car having been brought to the attention of the Petersburg authorities, the accused was arrested and put in jail.

Captain W. W. Jefferson, testified that he was the head of the Petersburg police department, and that accused was arrested and brought to police headquarters on Saturday night, August 19, 1933; that he was warned that he did not have to make a statement, and asked if he had anything to say; that accused told him there was nothing for him to say; that he did not know anything about it and did not have anything to do with it; that he did not know Leonard Morgan and had never seen him; that he knew Hattie Morgan and had seen her once or twice at her home on High Pearl street; that he first saw her when she stopped him on the street and asked him if he sold "numbers," and he told

her that he did not. In answer to further questioning, accused stated that he had known Hattie Morgan about two months; that she did not pay him $300 to get medicine for her husband; that she had paid for a car for him, but she did not give him anything; that he had done her a favor by lending her $250, with the understanding that she was to pay him $50 for the loan of the money. Witness further testified that accused afterwards sent for him and told him that he wanted to talk; that Hamilton then said, "You people have got me charged with murder. I haven't committed no murder. Nobody has told you I was ever at that house, and you can't prove it"; that witness replied that he had not said he could; that accused then said: "Well, if you would say that I sold her something, that would be different, that would be a misdemeanor. If I sold you a gun, and you went out and killed somebody, I could not be charged with murder, that would be a misdemeanor." That accused then said if the witness and the Commonwealth's attorney would get together and let him be tried on a misdemeanor charge he was ready to talk and tell all he knew about it; that he could go and get the stuff and prove it; that witness told the accused he knew the stuff was arsenic, and accused made no reply, but shook his head and mumbled, "Oh, no."

On August 21, 1933, the body of the deceased was exhumed and an autopsy performed by Doctor McGill, the city coroner, who removed the liver, kidneys and brain from the body and sent them to the agricultural department in Richmond for analysis. On August 24, 1933, the body was again disinterred when the spleen, stomach and intestines were removed and likewise sent to Richmond for analysis. The results of the analyses was explained in detail by Mr. R. N. Gladding, witness for the Commonwealth, who testified that he had been employed as a chemist in the division of chemistry, Department of Agriculture and Immigration of the State of Virginia for the past six years. Mr. Gladding said that he had made an analysis of composite samples taken from the several organs which had been sent to him

for the purpose, and had also made separate analyses of samples taken from the same organs, the results of which show, according to his calculations based on weight of the several samples as compared to the weight of the whole body, that at the time the analysis was made the body of the deceased contained anywhere from .875 to 2.15 grains of arsenic. That he had also made an analysis of the two samples of embalming fluid used by the undertaker, and in the red fluid found .015 of a grain of arsenic per pint of fluid, which in the twenty-two ounces of fluid used in the embalming process, would be .0206 of a grain of arsenic.

It was shown that Hattie Morgan collected $3,025 insurance on the life of the deceased, in which was included a policy in the Metropolitan Life Insurance Company. It also appears from the evidence that the deceased was a heavy drinker, and was frequently drunk.

The accused testified in his own behalf that he did not know Leonard Morgan, and had never seen him; that he was engaged in the business of selling "numbers" and in this manner had become acquainted with Hattie Morgan about six months prior to the death of her husband; that he had sold Hattie Morgan numbers, and that on the Monday following the death of Leonard Morgan he had loaned Hattie Morgan $250, with the understanding that he would be repaid with $300 in a few days; that after loaning the $250 to Hattie Morgan, he met L. C. Cooper who advised him that Hattie Morgan would not repay him, and as a result he managed to get Hattie Morgan to guarantee to pay the Petersburg Motor Company for the car purchased by him, and also to pay the balance of the $300 due him to the Petersburg Motor Company at the same time; that he did not furnish any poison to Hattie Morgan, and that he had nothing to do with the death of Leonard Morgan; that he did not make the admissions as testified to by H. C. Davis, L. C. Cooper, B. J. Hill and Captain Jefferson.

As hereinbefore noted, it is contended by the defendant that the Commonwealth failed to prove the *corpus delicti,*

and *Jones' Case* (*Jones* v. *Commonwealth*), 103 Va. 1012, 49 S. E. 663, 665, is quoted as follows:

"The rule in criminal cases is that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, avails nothing unless the *corpus delicti,* the fact that the crime has been actually perpetrated, be first established. So long as the least doubt exists as to the act there can be no certainty as to the criminal agent. 1 Starkie on Ev., 510."

It is conceded by the Commonwealth that the *corpus delicti,* as well as the guilty agency, must be proven beyond a reasonable doubt. It is also admitted that the uncorroborated extrajudicial confessions of one accused of crime, standing alone, are not sufficient to establish the *corpus delicti* in any given case. The real question to be determined is, therefore, whether the admissions made by the accused in the instant case are corroborated to the extent that the jury was justified in finding that the deceased came to his death from poison administered by other hands than his own. As seen, it is testified by Mr. Gladding that, according to his analyses of the samples taken from the organs sent him for examination, after deducting the .0206 of a grain of arsenic contained in the embalming fluid, the amount of arsenic contained in the body of the deceased was between .855 and 2.12 grains. In other words, his testimony shows that there was a considerably greater quantity of arsenic contained in the body of the deceased at the time the chemical examination was made than was contained in the fluid used in the embalming process. This poison must, of course, have been given Morgan either by his own hands or those of some other person, and there is no evidence to indicate suicide.

Doctor McGill, who testified as an expert, expressed the opinion that a fatal dose of arsenic is between three and four grains; that it is tasteless and odorless; that the average time within which death will occur after taking is about twenty-four hours; that in his opinion a person could take arsenic in soup or food on a Wednesday night, be taken ill

during that night, revive, get out of bed, cut grass, do other odd jobs, be taken suddenly ill the next afternoon and die within one hour; that profuse perspiration, tight stomach, with a severe pain, labored or hard breathing, parched throat, inability to swallow liquids and inability to handle the legs in attempting to walk are all symptoms of arsenic poison; that there are other symptoms, but that the same ones do not occur in any given case; that the above are not all of the symptoms of arsenic poison, and that each of the above symptoms of arsenic poison may be a symptom of some other physical ailment; that when taken into the human body, arsenic is absorbed and distributed throughout the body, the flesh, bones, and the hair; and that as some of the arsenic is eliminated from the body after taking it, and before death, by stools, vomiting, perspiration and through the urine, it would be impossible to say from a chemical examination how much arsenic had been originally taken into the body. Doctor McGill further testified that in his opinion, from the results of the analyses made by the State chemist, death could have been caused by arsenic poison, though he could have died of angina pectoris or other natural causes.

Considering the testimony of Doctor McGill and Mr. Gladding, the symptoms exhibited by the deceased immediately before his death, and other surrounding circumstances, in connection with the admissions made by the accused, it seems to us that the evidence is sufficient to show that the deceased died from arsenic poison. Briefly summarized, the evidence shows that on July 4, 1933, the accused asked the witness Davis to take him to Richmond to get some medicine to use on a job he had to do at the corner of High Pearl and Virginia avenue, in knocking a man off his feet; a case in which a man had life insurance, and he was to get $300 for the job. Leonard Morgan lived at this address and died on July 20, 1933. His life was insured for a little over $3,000, and his wife, Hattie Morgan, collected the insurance. On July 24, 1933, accused told the witness L. C. Cooper that he had pulled a deal and was to

get two or three hundred dollars in a few days from Hattie Morgan on High Pearl street. The next day Cooper wrote a letter to Hattie Morgan warning her of the way accused was talking. A few days later accused went to Cooper's house with this letter in his pocket and accosted him about it. This circumstance shows that Hattie Morgan and the accused were keeping in touch with each other.

The accused next told Cooper that he had "pushed her old man over last Thursday evening. I will be a fat boy in a few days. I am going to get some money"; and asked Cooper how long it would take to get the money from the insurance company. In the meantime accused was negotiating with Myers for an automobile, telling him that he was to get some insurance money through the beneficiary. Hattie Morgan gave Myers an order on the insurance company for $300 for accused's benefit.

On August 3, 1933, accused called on Louise Brown and asked what she knew, if she had "seen that Morgan woman." Louise told him that she had not seen her, but had heard that her husband was dead. Accused then replied, "I know all about that, that's some of my work. Damn if we didn't knock him off. I can do anything I want to do." He said he was going to make her pay up; he was going to have a new car. That afternoon he proposed to Louise to knock Charlie Braxton, her boarder, off in order to collect his insurance.

He introduced himself to Reverend B. J. Hill on the street and told him he could show him how to make money; that they had gotten him to stop Leonard Morgan from the habit of drinking. "I found out how much money was behind him, and I bumped him off."

While he told Captain Jefferson that he had not committed any murder and that nobody could prove that he was up at that house, "If you would say that I sold her something that would be different. If I sold you a gun and you went out and killed somebody I could not be charged with murder, that would be a misdemeanor"; and he offered to talk if the authorities would agree to try him only on a misde-

meanor charge. The only inference to be drawn from the above is that the accused was ready to say that his only connection with the death of Leonard Morgan was that he had sold Hattie Morgan "something." It is quite true that it hardly seems credible that a sane man, guilty of such a crime as that with which the accused is charged, would boast of his guilt to apparently indiscriminate acquaintances, and even to strangers he met on the street, such as the colored minister Hill. We are not, however, concerned with the question of the sanity of the accused, since it was not raised in the lower court, nor questioned here. Such being the case we can only judge the evidence as we find it in the record, and as found by the jury. If they believed the testimony of the witnesses who testified as to the admissions made to them by the accused, that he received from Hattie Morgan $300 of the insurance money; that the body of the deceased contained an amount of arsenic largely in excess of the amount used in the embalming fluid, and that the deceased died from symptoms of arsenic poisoning; they had the right to conclude that the accused must be guilty, as he says he is, and that the means by which he accomplished the death of the deceased was through poison which he furnished for the purpose, even though he did not administer it himself.

For these reasons, the judgment of the lower court will be affirmed.

*Affirmed.*

EPES and HUDGINS, JJ., dissenting.

We dissent because in our opinion the evidence is not sufficient to support a finding that the *corpus delicti* has been established beyond a reasonable doubt.