# COURT OF APPEALS OF VIRGINIA

**Record No. 0037-25-1**

CINDY KIEFFER STONE, S/K/A
CINDY KEIFFER STONE
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Beales, Malveaux and Frucci

Argued by videoconference

Opinion Issued April 21, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Westbrook J. Parker, Judge Designate

Roger A. Whitus (Slipow & Robusto, P.C., on brief), for appellant.

Justin M. Brewster, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE MARY BENNETT MALVEAUX

Following a jury trial, the trial court convicted Cindy Kieffer Stone of arson of an occupied dwelling, in violation of Code § 18.2-77. On appeal, Stone argues that the trial court erred by denying her motion to suppress because the admission of her statements to police after she requested counsel violated her rights under the Fifth, Sixth, and Fourteenth Amendments. She also challenges the sufficiency of the evidence supporting her conviction. For the following reasons, we affirm the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

On review of the denial of a motion to suppress, an appellate court "state[s] the facts 'in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences'" from the evidence. *Hill v. Commonwealth*, 297 Va. 804, 808 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 413 (2017)). "We apply the same standard in reviewing the sufficiency of the evidence to support a conviction." *Ingram v. Commonwealth*, 74 Va. App. 59, 64-65 (2021).

<u>The Offense</u>

Stone married Chistopher Stone in 2012. In 2015, they purchased a condominium in Virginia Beach, and the following year they moved into the home. The condominium was located in a single structure that contained "two living units." The two units were physically divided by a wall where a chimney was located. Stone and Christopher lived in the unit on the front right side of the building. Patricia and Dennis Wance lived in the left side unit.

Due to martial problems, Christopher moved out of the condominium in the summer of 2019. Christopher left items behind in the home, including books. Stone continued living in the home after Christopher moved out.

Stone filed for divorce in November of 2020. She and Christopher did not have a good relationship during the divorce proceedings. Andrew Richmond, Christopher's divorce attorney, described the divorce proceedings as contentious and noted that Stone and Christopher "were unable to agree on even very simple things."

Prior to their divorce trial, Stone's divorce attorney filed a motion to withdraw because Stone had fired him. At a pretrial conference on July 27, 2022, Stone requested a continuance for the trial, which the court denied. The day before trial, an employee at a mental health facility in California, where Stone was staying, contacted Christopher's divorce attorney and the court,

- 2 -

asking for a continuance on behalf of Stone. The trial court again denied the continuance request. The trial, without Stone being present, went forward on August 4, 2022. The final decree, also entered on August 4, provided that Stone was to sign over the deed to the condominium to Christopher in order for him to sell it, with the proceeds to be divided between them. Christopher was awarded the exclusive use and possession of the residence beginning September 15, 2022.

In early September 2022, Stone was still living in the condominium. On Monday, September 12, she was supposed to go to her divorce attorney's office to sign over the deed to the condominium to Christopher.

That same day, a medical transport service drove the Wances' daughter, Kelly, to the Wances' condominium, arriving at 1:31 p.m. About 15 minutes later, Dennis went outside to walk the family's dog. As he returned and walked back up his driveway, Dennis saw Stone exit her front door. She was carrying a "laundry basket-type thing." Stone seemed surprised to see Dennis and then gave him a "smirk," which he described as a "very disconcerting look" that made him "a little concerned." Stone went out to her car, which was parked in front of her garage door, and placed the basket in the car. Then she went around to the side of her unit for a short period of time before she got into her car and drove away.

Around 2:00 p.m., Patricia smelled smoke in the Wances' condominium. She looked out the window and saw "black smoke billowing out" from front windows of Stone and Christopher's condominium. She ran downstairs, told her husband, and then ran outside with her husband and daughter. Once outside, they saw the windows to Stone and Christopher's unit "explode[]" and flames come out of the broken windows. The Wances' condominium had an odor of smoke for about two weeks after the fire, but there was no other damage to their unit.

- 3 -

Fire Investigator Robert Doran with the Virginia Beach Fire Department arrived at Stone and Christopher's condominium around 2:30 p.m. Doran walked through the residence with "Cinco," an "Accelerant Detection Canine." Cinco alerted to the presence of an odor of an ignitable liquid at 26 areas throughout the condominium. Thirteen samples from these 26 areas were submitted to the Virginia Department of Forensic Science for testing. The analysis demonstrated that each of the samples contained gasoline or petroleum distillates that can be found in cigarette lighter fluids, camp stove fuels, lamp oils, paint thinners, and insect sprays.

Twelve of the 26 alerted areas had been burned. Several of the burn areas had "no communication," meaning that "they [did not] touch" each other and thus their fires had been set independently.

During his investigation, Investigator Doran found several "fuel loads," which are "combustible material[s]" found "within a structure." He described several of the fuel loads as "abnormal" in that they were made of items that "wouldn't normally be there," like "a pile of books laying on the center of a floor." Doran also characterized these abnormal fuel loads as "created," meaning that they were not "consistent" with what would normally be found in a house, but were instead made of items "piled up and arranged in a specific area or location." These created fuel loads, found throughout the residence, consisted of small pieces of wood, books that Christopher left behind in the home, pillows, cushions, clothing, and wrapping paper. Doran estimated that "it would take hours" to create all the fuel loads.

Doran also smelled an odor of gasoline and charcoal lighter fluid throughout the home. In the kitchen, he observed that one of the burners on the gas stove was "in the on position." On the stairs, he found couch cushions that were burned "right in the center of the cushion," meaning that they "would have been ignited by an open flame." In an upstairs bedroom, Doran found a "pour pattern" in the carpet that was caused by the "arcing movement" that occurs when

fluid from a gasoline can is poured over a fuel load.  In the attic, he found a gasoline can that contained a small amount of gasoline.  In the hallway between the kitchen and the office, Doran saw a sign board with the sentence "I am in the process of systemic destruction" written on it. Christopher later identified the handwriting on the sign as Stone's.

In the garage, Doran found a large fuel load comprised of plywood, cardboard boxes, a lamp shade, a cloth, and some blankets and sheets.  He estimated that two gallons of gasoline had been saturated into the fuel load.  This fuel load was concerning to Doran because, had it ignited, it "would have been catastrophic" and caused a "violent explosion."

From his investigation, Doran ruled out accidental and natural causes of the fire and determined that the fire was "incendiary" in origin.

On the day of the fire, Stone admitted herself to the Hunter Holmes McGuire VA Medical Center in Richmond.  On September 22, 2022, she was discharged and then arrested and transported to the Virginia Beach Police Department for an interrogation with Doran and Fire Investigator Andrew Meyers.

The Interrogation

After advising Stone of her *Miranda*[2] rights, Doran asked Stone if she understood those rights, and in response Stone told Doran, "Yeah, I would love an attorney."  Doran then asked Stone, "So you don't want to talk to me at all?"  Stone shook her head no, and then responded, "What questions do you have?  Are you wanting to investigate my pedophile ex-husband?" Doran told Stone that was "part of it," but that he was "also interested in the fire," and wanted to be sure that Stone wanted to continue to speak with him.  Stone responded, "That depends on what your questions are and what your interest is."  Doran stated, "Ok.  Well, I told you.  And I'm being honest with you.  I'm interested in the pedophilia, the porn.  All of that."  Stone

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

responded, "Now, three years later. Now everybody's interested. Now. Is it your job to protect people or property?" After Doran told her that he worked for the fire department, Stone stated, "Well then you can't really help me now can you." Doran replied, "I can in a sense that if you tell me something then we have to look into it and somebody else is going to have to look into it." After this exchange, the interrogation continued for approximately two hours, with Stone and the investigators discussing both Christopher and the day of the fire.

Stone filed a motion to suppress all statements made during her custodial interrogation. The trial court denied the motion to suppress.

Proceedings at Trial

At trial, the Commonwealth played several short portions of Stone's interrogation for the jury. During one portion, in relation to her divorce, Stone told the investigators that the judge had no reason to not to award her the "home, spousal support, half of the stock, half of everything." She also stated that she could not understand "why the judge would decide I am worth nothing" and that "Kim Kardashian is not worth nothing" and "if I am Kim Kardashian I should be worth a couple mill[ion]." In a sarcastic tone, she told the investigators, "Maybe if you leave [veterans] alone in their homes they wouldn't be homeless. But no. Why would you let a veteran keep her VA-entitled home in a divorce. Why would you do that? We don't know. That's fucking crazy talk." When asked if she would return to the condominium "right now," Stone responded that she "did not really like rhetorical questions" and that she "[did not] have a home. The home that had my name on it is not mine anymore. My federally backed loan in my veteran name isn't mine." She also told investigators that she started moving out of the condominium in September 2022 because her daughter told her "the order said I had to be out by September 15 and the attorney confirmed that."

Related to her activities prior to the fire, Stone told investigators that the weekend before the fire, she used a truck to move items out of the condominium. She stated that it was her "intention" to get more items out of the condominium on the day of the fire. She also admitted that she was "supposed to go to the attorney's office and sign over some shit," and later stated that her "attorney wanted me to go sign some papers signing over the house on Monday."

Concerning the day of the fire, she told the investigators that the last thing she remembered that day was "being half-way between Richmond and Virginia Beach on the interstate." She said that she was driving to her daughter Julia's house, but then thought she could not go there because "You'll get Julia in trouble too. Like you're fucked up. You're seriously fucked up." When asked why she would get Julia in trouble, Stone responded, "For my actions. Cause I'm seriously fucked up." When asked if she could change anything about the day of the fire, she stated, "Why did you pick [that day]? Why didn't you pick . . . any of the other significant days in my life where I have been mocked by judges and raped by attorneys. Why didn't you pick any of those days? Because those are the days I would like to change."

At one point, in reference to obtaining a storage unit, Stone also said, "If only I had left it all in there. That would have been smart." When discussing the storage unit with Meyers, the investigator told her she could have left her personal items in the condominium. Stone agreed, stating, "In hindsight that probably would have been smarter but as you can tell I didn't have much of a fucking plan."

Christoper, a structural engineer, testified that the wall separating the two condominium units was a partial firewall "between the two living spaces, but not in the attic," which had the purpose of preventing fire from spreading from one unit to the other. He further testified that because the firewall did not extend through the attic and above the roofline, a fire that reached

the attic could have spread to the other unit. Doran also testified that a fire could have spread from one unit to the other through the attic due to the lack of an attic firewall.

After the Commonwealth rested, Stone moved to strike the evidence. She argued that the evidence established only that a fire was intentionally set and that she had opportunity and motive to set a fire, which was insufficient to sustain a conviction for arson. The trial court denied the motion.

Stone then testified on her own behalf and stated that she had no memory of starting the fire. She explained that when she told the fire investigators that she could not go to Julia's house the day of the fire, she was "specifically referring to my mental health" and "had been suicidal and I did not want to make [Julia] responsible for that or . . . have her be the one to find me in such a state" if she had committed suicide. Stone also explained that when she told the investigators that she did not have much of a plan she had been referring to her "moving plan."

After presenting evidence, Stone renewed her motion to strike. She restated her earlier argument and further contended that the evidence did not establish that the condominium was occupied at the time of the fire. The trial court denied the motion. In doing so, it explained that there were "two problems with the argument, and that is, number one, she was actively there still moving things. So it's occupied in that regard." Second, the court noted that "the Wances lived in the adjoining building."

The jury found Stone guilty of arson of an occupied dwelling. This appeal followed.

ANALYSIS

A. Motion to Suppress Statements

Stone argues that the trial court erred in denying her motion to suppress her statements made during her custodial interrogation because her statement that she "would love an attorney"

was a clear invocation of her right to counsel and all further questioning should have immediately ceased.

"The principle is now well-established that, pursuant to the Fifth Amendment of the United States Constitution, law enforcement officers must inform a suspect in a custodial interrogation of certain rights, including the right to remain silent and to have the assistance and presence of legal counsel during the interrogation." *Bass v. Commonwealth*, 70 Va. App. 522, 539-40 (2019) (quoting *Stevens v. Commonwealth*, 283 Va. 296, 302 (2012)). "If the accused expresses a desire to have counsel present during a custodial interrogation, law enforcement officers must cease their interrogation until counsel is present or the accused initiates further communication with the authorities." *Stevens*, 283 Va. at 302. "The question whether a suspect actually invoked his right to counsel involves an objective inquiry." *Bass*, 70 Va. App. at 540 (quoting *Commonwealth v. Hilliard*, 270 Va. 42, 49 (2005)). "The demand must be stated such that a 'reasonable police officer under the circumstances would understand the statement to be a request for counsel.'" *Id.* (quoting *Hilliard*, 270 Va. at 49).

Assuming without deciding that the admission of Stone's statements at trial was error, we conclude the admission of that evidence was harmless beyond a reasonable doubt.[3] "Code

---

[3] Stone testified at trial about some of the statements introduced by the Commonwealth, offering her explanation for why she told the investigators certain things. The Commonwealth argues that Stone waived her objection to the admission of these statements by introducing evidence of a similar character in her case-in-chief. The Commonwealth also notes that in *Paxton v. Commonwealth*, 80 Va. App. 449, 469 (2024), *reversed on other grounds*, 304 Va. 298 (2025), this Court "decline[d] to apply the same-evidence principle where the defendant claimed his statements were obtained in violation of the Fifth Amendment but also testified about the statements during his case-in-chief." This Court held that "when the prosecution's illegally-obtained evidence impels the defendant's testimony, that impelled testimony cannot be used as a loophole to cleanse the illegally-obtained evidence." *Id.* at 466. Our Supreme Court reversed, finding admission of the statements at issue was harmless, and did not address the same-evidence issue. *Paxton*, 304 Va. at 304.

The Commonwealth argues that to the extent our analysis in *Paxton* remains good law, "Stone was not impelled to testify about her statements and would have testified to their content regardless of the Commonwealth's introduction of the statements," because her "defense largely

§ 8.01-678 makes 'harmless-error review required in *all* cases.'" *White*, 293 Va. at 420 (quoting *Commonwealth v. Swann*, 290 Va. 194, 200 (2015)). Under Code § 8.01-678, "no judgment shall be arrested or reversed" if "it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Even errors "arising from the denial of a constitutional right are subject to a harmless error analysis." *Angel v. Commonwealth*, 281 Va. 248, 264 (2011). When addressing error involving a constitutional violation, the Commonwealth must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Quinn v. Commonwealth*, 25 Va. App. 702, 719 (1997) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "The admission of evidence obtained in violation of the federal constitution is reversible error if 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)).

In determining whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction, "the court must consider, among other factors, 'the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.'" *Zektaw v. Commonwealth*, 278 Va. 127, 139-40 (2009) (quoting *Pitt v. Commonwealth*, 260 Va. 692, 695 (2000)).

---

relied on her mental health evidence, the only evidence of which was provided by her statements to the officers and her testimony." Because we conclude that deciding this case on harmless error grounds is the best and narrowest basis for our decision, we decline to address the Commonwealth's same-evidence argument. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (noting that "the doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (quoting *White*, 293 Va. at 419)).

We first note that Stone's statements admitted at trial, while supporting the inference that she had been involved in setting the fire, were not the gravamen of the Commonwealth's case due to their limited probative value. The statement most helpful to the Commonwealth's case was Stone's comment that she did not go to her daughter's house because she would get her daughter in in trouble due to her "actions," which were "seriously fucked up."[4] While the jury could infer that this statement was related to Stone's actions in setting the fire, the statement itself was not a confession to the offense. The other statement most helpful to the Commonwealth's case was Stone's comment that leaving her items in the condominium, instead of moving them into a storage unit, "[i]n hindsight . . . probably would have been smarter but as you can tell I didn't have much of a fucking plan." While the jury could infer that the "plan" Stone referred to was her plan to set fire to the condominium, this statement was also not a confession to the offense. "The court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence." *Quinn*, 25 Va. App. at 720 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 313 (1991) (Kennedy, J., concurring)). Here, the statements that provided the most support for the Commonwealth's case were not actual confessions to the crime, but instead were isolated statements that were inculpatory only when viewed in conjunction with the rest of the Commonwealth's evidence.

In addition, many of Stone's statements were cumulative of other evidence admitted at trial. Several of her statements demonstrated that her divorce proceedings were acrimonious,

---

[4] The Commonwealth did highlight this statement and its probative impact in its closing argument to the jury. Referring to this statement, the Commonwealth's attorney told the jury, "For her actions. That's why she would get her daughter in trouble, is for her actions. What actions? Building twenty-six created fire loads throughout" the condominium.

indicating a motive for her to set the fire. But other evidence at trial established that Stone and Christopher's divorce proceedings were hostile. Christopher testified that he and Stone did not have a good relationship during the divorce proceedings, and his divorce attorney also described the divorce proceedings as contentious. Also, in regard to motive, in some of Stone's statements admitted at trial she said that she was supposed to sign something at her attorney's office and that she knew that the court order related to her divorce required her to leave the condominium by September 15. These statements were again cumulative of evidence provided by Christopher and his divorce attorney, who both testified that Stone was supposed to go to her attorney's office to sign over the deed to the condominium to facilitate its sale.

The evidence adduced at trial established that Stone had a motive to set fire to the condominium due to her acrimonious divorce from Christopher and the loss of the condominium as her home. On the day of the fire, Stone was supposed to go to her divorce attorney's office to sign over the deed to the condominium. That day, Dennis Wance saw her at the condominium shortly before the fire was discovered. In addition, there was overwhelming evidence supporting the finding that the fire was set intentionally. A police canine alerted to the presence of an ignitable liquid in 26 areas throughout the condominium. Testing of 13 samples taken from these areas revealed that each contained gasoline or petroleum distillates. Several of the 12 areas burned in the residence had "no communication," meaning that "they [did not] touch" each other and had ignited separately. Doran found several abnormal fuel loads—fuel loads that had been created, rather than occurring naturally—throughout the residence, which consisted of small pieces of wood, books that Christopher left behind in the home, pillows, cushions, clothing, and wrapping paper. Doran also found a burner on the gas stove that was in the on position; couch cushions that were burned "right in the center of the cushion," meaning that they "would have been ignited by an open flame"; and a "pour pattern" in the carpet that was caused by the "arcing

movement" of a can pouring gasoline over a fuel load. Doran's investigation led him to conclude that the fire was incendiary in origin. He also estimated that it would have taken "hours" to create all the fuel loads he found in the condominium, which indicated that they already were present when Dennis saw Stone exit her unit. Further probative of Stone's identity as the perpetrator of the fire, a sign board with the sentence "I am in the process of systemic destruction," written in Stone's handwriting, was found in the condominium.

In total, the overall strength of the Commonwealth's case—including the evidence of Stone's motive, her presence in the condominium shortly prior to the fire, and the amount of time that was required to prepare the fuel loads—combined with the limited import of Stone's statements, many of which were cumulative of other evidence, compels the conclusion that any error was harmless beyond a reasonable doubt.

## B. Sufficiency of the Evidence

Stone challenges the sufficiency of the evidence on two grounds. She first argues the evidence was insufficient to prove her identity as the arsonist. She also asserts the evidence did not establish that the condominium was "occupied" at the time of the fire.[5]

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition

---

[5] Stone also argues that the evidence did not establish the requisite intent to support her conviction due to her multiple mental health symptoms and inpatient treatment at the time of the arson. She, however, did not make this argument at trial, thus we do not address it on appeal. *See* Rule 5A:18.

it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Atkins v. Commonwealth*, 85 Va. App. 542, 548 (2025) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)). Under this standard, "we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient. Instead, in an appellate sufficiency review, the evidence is 'considered as a whole.'" *Barney*, 302 Va. at 97 (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

However, "[t]o the extent our analysis of the sufficiency of the evidence requires us to examine the statutory language, we review issues of statutory construction *de novo* on appeal. This same *de novo* standard of review applies to determining the proper definition of a particular word in a statute." *Miller v. Commonwealth*, 64 Va. App. 527, 537 (2015) (citation omitted). "When interpreting a statute, a court 'must presume that the General Assembly chose, with care, the words that appear in [the] statute, and [it] must apply the statute in a manner faithful to that choice.'" *Sorrell v. Commonwealth*, 74 Va. App. 243, 246 (2022) (alterations in original) (quoting *Johnson v. Commonwealth*, 292 Va. 738, 742 (2016)). "Consequently, we 'apply[] the plain meaning of the words unless they are ambiguous or [doing so] would lead to an absurd result.'" *Id.* (alterations in original) (quoting *Eley v. Commonwealth*, 70 Va. App. 158, 164 (2019)). Accordingly, "'[w]ords and phrases used in a statute' are interpreted in light of 'their ordinary and usually accepted meaning[s].'" *Id.* (alterations in original) (quoting *Mejia v. Commonwealth*, 23 Va. App. 173, 176 (1996)).

Turning to Stone's first argument, she cites *Garner v. Commonwealth*, 26 S.E. 507 (Va. 1897), and *Jones v. Commonwealth*, 103 Va. 1012 (1905), as "factually similar cases . . . [that]

- 14 -

establish that the fact that a fire was incendiary and that an accused had an opportunity and motive to set such fire are insufficient to prove an arsonist's identity." But her reliance on these cases is misplaced, as both are factually distinguishable. Significantly, in neither case did evidence connect the defendant to the location of the arson shortly before the fire was discovered. In *Garner*, a mill house was burned, and tracks were found the morning after the fire leading from the mill to the defendant's house. 26 S.E. at 507. The defendant, who disliked the mill's owner, admitted to passing by and stopping at the mill house the evening of the fire and making the footprints. *Id.* Our Supreme Court held that this evidence alone was insufficient to support an arson conviction, because "[t]he utmost that can be said of the proof is that it shows the burning of the mill as the act of an incendiary, that the prisoner had the opportunity to commit the crime, and that he cherished ill feelings towards the owner of the property destroyed." *Id.* at 507-08. In *Jones*, two barns, a fodder rick and a straw rick were set on fire. 103 Va. at 1013. The only evidence connecting the defendant to the fire was his animosity toward the structures' owner and a set of horse tracks leading from the barns to the defendant's house. *Id.* at 1014-16. While the horse tracks matched the hooves of a horse owned by the defendant's father, "[t]here was nothing . . . peculiar about the horse's feet to distinguish the tracks made by it from tracks that may have been made by some other horse." *Id.* at 1016. The Court held that the evidence that "the fire was incendiary, that the defendant had an opportunity to commit the crime, and that he cherished ill-feelings towards . . . the owner of the property destroyed . . . is not sufficient to warrant a conviction." *Id.* at 1021-22.

Here, in contrast to *Garner* and *Jones*, the evidence established that the condominium was filled with deliberately created fuel loads that would have taken hours to put together. Stone was seen leaving the residence minutes before the windows of the condominium exploded and fire began billowing out. The evidence, therefore, did not simply consist of the fact that the fire

was incendiary in origin, together with Stone's motive and opportunity; it also contained evidence of her presence at the location of the fire shortly before it occurred.

Stone further argues that the trial court erred in denying her motion to strike because the evidence did not demonstrate that the condominium was "occupied" at the time of the fire. Code § 18.2-77(A) prohibits an individual from maliciously burning "any dwelling house . . . or other house in which persons usually dwell or lodge." By contrast, subsection (B) of Code § 18.2-77 criminalizes "[a]ny such burning or destruction when the building or other place mentioned in subsection A is unoccupied" and establishes a lesser degree of punishment for that offense.

In *Marable v. Commonwealth*, 27 Va. App. 505 (1998), an arson case in which this Court rejected the defendant's argument that a house was unoccupied because no one was present inside it at the time of the fire, this Court noted that for purposes of the statute, "unoccupied" is defined as "'not occupied by inhabitants' or 'relating to . . . premises on which no one is *living* although the furniture and fixtures have not been removed.'" *Id.* at 512 (alteration in original) (quoting *Unoccupied*, *Webster's New International Dictionary* (3d ed. 1986)). Utilizing this definition, Stone argues the evidence at trial established that "although there was still some furniture and other items within, no one was living in the house at the time of the fire," and thus it was unoccupied for purposes of Code § 18.2-77(A) and (B). We disagree.

A "dwelling house" is defined as "[t]he house or other structure in which one or more people live" and "[a] building [or] part of a building . . . that is used or intended for use as a human habitation." *Dwelling-House*, *Black's Law Dictionary* (12th ed. 2024). Consistent with these definitions, the jury in this case was instructed that "[a] dwelling house is any structure in which one or more persons usually dwell or lodge." Based on the evidence in the record, a reasonable fact finder could have found that the arson was committed in a dwelling house, as the condominiums were two parts of a single structure separated only by a wall that would not have

prevented a fire from spreading from one condominium to the other, especially through the attic. While there was evidence that Stone intended to no longer inhabit the condominium unit belonging to her and Christopher, the other unit was inhabited by the Wances at the time of the fire.[6] So Stone's argument that her particular condominium was unoccupied at the time of the arson fails because she maliciously burned a dwelling house that was occupied at the time of the fire—the single structure that housed the two condominium units. *See State v. Wyatt*, 269 S.E.2d 717, 718 (N.C. Ct. App. 1980) (holding that an apartment building with six units "constituted one dwelling house such that the requirements of a burning could be satisfied by the charring in [one unit] while the requirement of occupancy could be satisfied" by a tenant's presence in another unit). Accordingly, we reject Stone's argument that that the evidence was insufficient to sustain her conviction for arson of an occupied building under Code § 18.2-77(A).[7]

## CONCLUSION

We hold that the trial court did not err in denying Stone's motion to suppress. We also find the evidence sufficient to support her conviction. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

---

[6] Patricia testified that they were "living" in their unit on the day of the fire, and both Patricia and Dennis testified that they still lived there at the time of trial. Both testified about watching television, eating lunch, and doing work and chores in their home on the day of the fire. At the time of the arson, the Wances clearly inhabited part of the single building containing both condominium units.

[7] We also note that the jury could have reasonably found that the condominium was occupied at the time the fire was set based on the trial court's alternate reasoning—it took Stone several hours to create all the fuel loads that were created in the residence, and she was seen leaving the condominium with a laundry basket that she placed in her car. The jury could infer that Stone was moving items out of the house, and thus still occupying it, when the arson occurred.